IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 12, 2006

## CHRISTOPHER NEIL SCHULTZ v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-A-432     J. Randall Wyatt, Jr., Judge**

_____

**No. M2005-02464-CCA-R3-PC - Filed January 5, 2007**

_____

On March 3, 2004, Petitioner, Christopher Schultz, pled guilty to two counts of first degree murder. The trial court sentenced Petitioner to serve two concurrent life sentences. On November 30, 2004, Petitioner filed a petition for post-conviction relief which the post-conviction court subsequently denied. In this appeal, Petitioner argues that the post-conviction court erred in denying him post-conviction relief because his guilty pleas were not knowingly and voluntarily entered. After a thorough review of the record, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Christopher Neil Schultz.

Robert E. Cooper, Jr., Attorney General and Reporter; C. Daniel Lins, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; and Kathy Morante, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

### I. Guilty Plea

At the guilty plea proceedings, the trial judge explained to Petitioner that he was pleading guilty to two counts of first-degree murder, and that as a result he would be required to serve concurrent life sentences and would not be eligible for parole until after service of fifty-one years. Petitioner acknowledged that he understood what he was pleading guilty to and the sentence he would receive in exchange for his plea. The trial judge then explained that Petitioner had a right to a trial by jury. The judge described the process of selecting a jury and conducting a trial, along with the presumption of innocence cloaking Petitioner, the State's burden of proof, the right to present evidence, and the right to confront the witnesses against him should Defendant opt for a jury trial.

Petitioner again acknowledged his understanding of these rights and his understanding that by entering a plea of guilty he was relinquishing these rights.

Petitioner acknowledged that he had read over the guilty plea petition in detail with his lawyer. He affirmed that his lawyer had explained the provisions of the petition to him, and that he had signed the petition acknowledging his understanding of the provisions as well as his actions in entering a guilty plea. He affirmed that his decision to enter a guilty plea was voluntary. Petitioner's trial counsel acknowledged that he had spoken to Petitioner, and that Petitioner's plea was voluntarily, knowingly, and understandingly entered after discussion with counsel. Trial counsel expressed his own reservations about the plea, but Petitioner re-affirmed that it was his own personal decision, and that he was making the decision voluntarily.

Following the guilty plea colloquy, the following facts were stipulated:

The proof in this case would show that on November 25th of 2002, witnesses saw an individual, a male, go up to a car, which was parked in the Outer Limits' parking lot, which is a club here on Nolensville Road in Davidson County, Tennessee. They watched as this individual went up to the automobile that was parked, stand near it and fire five to six times into that automobile. There was a pause, perhaps for reloading, and then there were additional shots. The individual who was doing the shooting very calmly stopped, reached to the ground and picked up something believed to be shell casings, again, according to several eyewitnesses. That individual then got into the passenger side of a Saturn vehicle, which was parked nearby.

One of the witnesses was a security guard, who was employed by Outer Limits, who witnessed this. He immediately got into his vehicle, which just so happened to have a video camera in it. He followed the vehicle as it drove out of the parking lot. he followed it for quite some ways onto the interstate. He was able to get the license plate on the video, as well as some depiction of the individual who was sitting in the passenger side of the car, who was, in fact, the shooter. He eventually was - - had to stop pursuit of that vehicle because it had pulled into what he believed was a dead[-]end lane and he was afraid for his safety. This information, including the video tape and the statements of other witnesses, were given to the police.

The police were able to locate the identity of that vehicle. It belonged to the mother of the co-defendant in this case, Maurice Tyler. It was learned, however, that the mother had, in fact, given that car to this defendant, Mr. Schultz. Mr. Schultz was brought in for questioning. He admitted that the Saturn, in fact, was his car. He, at that point, denied involvement with the shooting. He denied that there was anybody else in the car, although, again, witnesses and the videotape indicated that involvement.

-2-

Additional evidence, including various statements that were taken by witnesses, caused the police to believe that the shooter in this case was, in fact, Mr. Tyler. They were able to determine that one of the victims, Mr. Monte Campbell, the male victim, had a few years before, committed a home invasion of Defendant Tyler's home in Lewisburg, Tennessee. Mr. Campbell did approximately three years in prison for that crime. However, on the day that the plea in that case was taken, Mr. Tyler was heard by a police officer, a Lewisburg police officer, to say that he was going to kill Mr. Campbell when Mr. Campbell was released from prison. In fact, Mr. Campbell had been released from prison just a short time prior to this murder. The other victim, Ms. Kyra Carew, was simply an innocent victim who was in the wrong place at the wrong time and Mr. Tyler simply did not care, because it is the State's belief that he was out on a revenge killing to kill Mr. Campbell.

Therefore, it is the State's proof - - it would be the State's proof at trial, which is currently set a short time from now, that Mr. Tyler was the shooter, Mr. Schultz was the driver of the vehicle and, in fact, drove the getaway car after these two victims were murdered.

I would state for the record that, quite obviously, Mr. Tyler has been severed and his case will go forward. I would also point out that family members of both victims are here in the Court today and obviously are aware of this plea.

The trial judge clarified that Petitioner was being convicted on a theory of criminal responsibility in that, as the driver of the getaway car, he aided and abetted the shooter, Mr. Tyler. Based on the stipulated facts, Petitioner stated that he was pleading guilty to two charges of first degree murder.

## II. Post-Conviction Hearing

At the post-conviction hearing, Petitioner testified that six months after the incident, he was incarcerated and awaiting trial at the Criminal Justice Center (CJC) when he gave a statement to Detective Crumby confessing his involvement in the murders. He said that his lawyer was not present and he was on medication at the time of his confession. Petitioner could not remember what medicine he was taking.

Petitioner said that when he entered his guilty plea, "[he] thought [he] was pleading to actually being the shooter in the case. And, the only reason [he] was pleading to that was [be]cause [he] was being threatened." He explained that he was being personally threatened by his co-defendant, Mr. Tyler. These threats were also the reason he testified that he was the shooter at Mr. Tyler's trial. He said that members of Mr. Tyler's "entourage" or "crew" were present at every court appearance. Petitioner said that although the stipulated facts clearly indicated he was being convicted for his role as driver, he was "medicated" and "didn't really think . . . that he was suppose to be listening to that." He thought he was pleading guilty to being the shooter based on prior

discussions between he and counsel. He assumed that counsel had relayed their discussions and reached an agreement with the district attorney. Petitioner said that he would not have agreed to two life sentences for driving a car.

Petitioner testified that as a youth he had been treated for mental illness. He said that in the months leading up to his guilty plea hearing and at the hearing, he was on various forms of medication which "really slowed [him] down" and made him less coherent. At the time of his plea, Petitioner felt "depressed" and "threatened," and like "if [he] didn't accept the plea, then something would of happened to [him] or [his] family." Petitioner said that although he denied being forced to plead guilty at his hearing, this denial was out of fear that Mr. Tyler would do something to hurt him if he reported the threats.

On cross-examination, Petitioner testified that he did not tell his attorney that he was being threatened in prison out of fear that he would be assaulted by Mr. Tyler. He did request that the prison authorities move him to another area, but because he did not specify the reason for his requests to be moved, he was repeatedly placed in proximity to Mr. Tyler. He was finally moved to solitary or maximum security after he was involved in several fights. He reiterated that he would not have plead guilty had it not been for the threats he was receiving from Mr. Tyler. Neither the State, the detectives, or the attorneys involved threatened or pressured Petitioner to plead guilty.

Petitioner's trial counsel, Jonathan Wing, testified that he had been an attorney at the public defender's office for nine years, practicing solely criminal law. During his representation of Petitioner, he determined Petitioner to be a "very rational" and "competent" individual. He said that the case was unusual because from the beginning Petitioner wanted to plead guilty to being the shooter. He was concerned about this because the State's theory was that Petitioner was the driver, not the shooter, and all the evidence indicated that Mr. Tyler was the shooter.

Because of his difficulty in comprehending Petitioner's decision to plead guilty, trial counsel arranged for Petitioner to be examined by a psychiatrist. The psychiatrist found Petitioner "intelligent" and "articulate" and reported no mental deficiency that would serve as a defense in Petitioner's case or explain his decision to plead guilty to something he did not do. Trial counsel repeatedly advised Petitioner that he was making a bad decision by pleading guilty to a life sentence in what was a "pretty defensible case." He told Petitioner that it would be "terrible" to take the blame for someone else. Petitioner persisted in wanting to plead guilty, and said he wanted to be sentenced to a mental health treatment facility.

Trial counsel said that although Petitioner never said that he was being threatened, he suspected that he was and asked Petitioner, as often as possible, whether this was the case. Petitioner maintained his guilt and never acknowledged any threats. Trial counsel said that prior to entering his guilty plea, Petitioner had many visitors at the CJC. Most of the visitors were members of Mr. Tyler's family as were most of the telephone calls Petitioner received. There were no visits by Petitioner's own family members. Trial counsel continued to try to persuade Petitioner not to plead guilty because of threats or pressure. He also spoke with the District Attorney's office to try and

-4-

work out a deal based on his belief that Petitioner was being pressured. The State agreed to sever the defendants only if Petitioner agreed to plead guilty to being the driver, not the shooter. Trial counsel and Petitioner discussed the agreement and exactly what Petitioner would be pleading guilty to, including the State's stipulated facts, should Petitioner go forward with the plea. When asked if Petitioner understood the stipulated facts and the charges against him, trial counsel stated, "I can't imagine he didn't know."

## III. Analysis

Petitioner claims that he is entitled to post-conviction relief because his guilty pleas were not knowingly and voluntarily entered. Specifically, he argues that he entered a guilty plea as a direct result of Mr. Tyler's threats and assaults against his person. He relies on medical records from his incarceration as proof that he was being threatened and assaulted by Mr. Tyler at the CJC. Petitioner also argues that because the CJC failed to act to protect him from Mr. Tyler's threats and assaults by routinely placing Petitioner and Mr. Tyler in close proximity to one another, the State is responsible for the threats which induced Petitioner to plead guilty.

Under our statutory law, the petitioner bears the burden of proving the allegations in his post-conviction petition by clear and convincing evidence. T. C. A. § 40-30-110(f) (2003). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, the findings of fact made by the post-conviction court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. *Brooks v. State*, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the petitioner to show that the evidence preponderated against those findings. *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

In *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), the United States Supreme Court ruled that defendants should be advised of certain constitutional rights before entering pleas of guilt. Included among those are admonitions regarding the right against self-incrimination, the right to confront witnesses, and the right to trial by jury. *Boykin*, 395 U.S. at 243, 89 S. Ct. at 1712. "[T]he core requirement of *Boykin* is 'that no guilty plea be accepted without an affirmative showing that it was intelligent and voluntary.'" *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Fontaine v. United States*, 526 F.2d 514, 516 (6th Cir. 1975)). The plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S. Ct. 160, 164, 27 L. Ed. 2d 162 (1970). If the proof establishes that the petitioner was aware of his constitutional rights, he is not entitled to relief. *Johnson v. State*, 834 S.W.2d 922, 926 (Tenn. 1992). A plea which is the product of "ignorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats" is not voluntary. *Boykin*, 395 U.S. at 242-43, 89 S. Ct. 1712.

In accepting a guilty plea, the trial court must ascertain whether the defendant fully understands the significant consequences of his or her plea. *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999). In making this determination, the trial court may consider a number of factors including the defendant's relative intelligence, his or her familiarity with criminal proceedings, whether the defendant was represented by competent counsel and had the opportunity to confer with counsel about options, the advice given by counsel and the trial court about the charges against the defendant and the penalty to be imposed, and the defendant's reasons for pleading guilty. *Blakenship v. State*, 858 S.W.2d at 904.

The post-conviction court found as follows:

The Court finds that the Petitioner asserts that his plea of guilty was involuntary based on the physical harm and threatened physical harm from Mr. Tyler and his cohorts. The Court relies on its above findings that the Petitioner was fully aware of the rights he was waiving by entering the guilty plea, as well as the consequences of entering the guilty plea. The Court finds that the Petitioner never informed the Court, his attorney, the staff at CJC, the investigators, or anyone of any threats of violence he received prior to or on the day of the plea. The Court finds that the Petitioner acknowledged that he was pleading guilty of his own voluntary decision. The Court finds that Mr. Wing also acknowledged that after talking with the Petitioner and going over the plea petition on the day of the plea, he believed that the Petitioner was pleading guilty of his own voluntary decision. The court is of the opinion that the Petitioner understood that entering a plea of guilty was his own decision and that no one could force or compel him to enter the plea of guilty. The Court is of the opinion that the Petitioner's decision to plead guilty and accept a life sentence, although not the decision completely endorsed by his attorney, was nevertheless his decision and entered with full awareness of his rights and the resulting consequences. The Court is of the opinion that the Petitioner's decision to plead guilty represents a voluntary, knowing, and intelligent choice among the alternative courses of action available to the Petitioner.

Upon reviewing the grounds contained in the Petition and considering the proof at the hearing, the Court is of the opinion that, for the aforementioned reasons, the Petition for Post-Conviction Relief should be denied.

It is our view that nothing in the record preponderates against the post-conviction court's findings. As such, the post-conviction court properly denied the petition. The record of the guilty plea proceedings reflects that Petitioner voluntarily plead guilty. He affirmed the facts as stipulated by the State. He acknowledged that he understood the charges against him as well as his right to a trial in order to defend himself against those charges and confront his accusers. He further acknowledged that he was relinquishing those rights by submitting a guilty plea.

The record from the post-conviction hearing likewise reflects that Petitioner's plea was voluntary. Specifically, the record indicates that Petitioner was represented by competent counsel with extensive experience. Trial counsel hired a psychiatrist to examine Petitioner prior to his plea in order to determine whether he was capable of making a rational decision. Both trial counsel and the psychiatrist found Petitioner to be competent, rational, and capable of making a knowing, voluntary decision. The psychiatrist also found Petitioner articulate and intelligent. Trial counsel and Petitioner had several discussions in which trial counsel pleaded with Petitioner to go to trial and forego his guilty plea. Despite the evidence and trial counsel's extensive efforts to persuade him otherwise, Petitioner insisted on proceeding with his guilty plea.

As noted by the post-conviction court, trial counsel testified that it was his opinion that Petitioner's plea was knowingly and voluntarily entered. Although Petitioner now contends that his plea was involuntarily entered because it was given under threats of assault and actual assault from Mr. Tyler, and that the State enabled these threats, he failed to inform anyone of this fact prior to entering his guilty plea. Additionally, although Petitioner offers his medical records as proof that the State was aware he was being assaulted by Mr. Tyler, there is nothing in the medical records linking Mr. Tyler with Petitioner's injuries. Applying the above stated principles, we conclude that Petitioner has failed to establish by clear and convincing evidence that his pleas were involuntarily entered. Accordingly, Petitioner is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE